**KRONENBERGER BURGOYNE, LLP**
Karl S. Kronenberger (SBN 226112)
Virginia A. Sanderson (SBN 240241)
150 Post Street, Suite 520
San Francisco, CA 94108
Telephone: (415) 955-1155
Facsimile: (415) 955-1158
karl@KBInternetLaw.com
ginny@KBInternetLaw.com

Attorneys for Defendants Mobile Motion, Inc.,
Doron Kim, and E Dating For Free, Inc.

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **GLOBAL DEVELOPMENT STRATEGIES, INC.**, *et al.*,<br><br>　　　　Plaintiffs,<br><br>　　vs.<br><br>**MOBILE MOTION, INC.,** *et al.*,<br><br>　　　　Defendants. | Misc. Case No.:_____<br><br>Case No. CV11-01966 CAS (AGRx)<br>Central District of California<br><br>**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO QUASH THIRD-PARTY SUBPOENAS** |

CASE NO.                                    DEFENDANTS' MPA ISO MTN. TO QUASH THIRD-PARTY SUBPOENA

Defendants Mobile Motion, Inc., Doron Kim, and E Dating For Free, Inc. (collectively, "Defendants") respectfully submit the following memorandum of points and authorities in support of their motion to quash the subpoenas to Google, Inc. ("Google"), Microsoft Corporation ("Microsoft"), and Rackspace, Inc. ("Rackspace").

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION AND STATEMENT OF FACTS

#### A. Mobile Motion's Internet Marketing Business

Defendant Mobile Motion, Inc. ("Mobile Motion") is engaged in the business of Internet marketing. (Declaration of David Perez in Support of Defendants' Motion to Quash Third-Party Subpoenas ["Perez Decl."] ¶ 3.) Mobile Motion generates customer leads by registering domain names and creating websites for its client's products and services. (*Id.* ¶ 4) In designing these websites, Mobile Motion employs Search Engine Optimization ("SEO") and other techniques that improve the website's ranking in search engine results for common search terms related to the client's products and services. (*Id.*)

Mobile Motion also develops and maintains pay-per-click ("PPC") advertising campaigns for its websites. (*Id* ¶ 5.) PPC is a popular online advertising model that allows a marketer, such as Mobile Motion, to ensure its advertisements are directed by publishers, such as Google, to persons interested in the client's products and services. Google's AdWords program and Microsoft's AdCenter program are two of the most well-known PPC platforms. As part of these campaigns, Mobile Motion selects and bids on certain keywords and phrases relevant to its client's target market. (*Id.*) Mobile Motion also creates advertisements that appear on the publisher's website when a consumer searches for a keyword or phrase in Mobile Motion's PPC campaign. (*Id.*) These advertisements link to one of Mobile Motion's websites and thus result in additional customer leads for its clients. (*Id.*)

Both SEO and PPC are emerging technologies that are changing the dynamics of the marketing industry. Their popularity and buzzworthiness are evident on

KRONENBERGER BURGOYNE, LLP
150 Post Street, Suite 520
San Francisco, CA 94108
www.KBInternetLaw.com

1  Amazon.com, which contains over a thousand recent publications dedicated to either
2  improving SEO techniques or launching effective PPC campaigns.  Expertise in both of
3  these areas is in high demand, and those who have succeeded generally keep their SEO
4  techniques and PPC keywords and phrases highly confidential.  Mobile Motion is no
5  exception.  (*Id.* 14.)

6  Plaintiffs Global Development Services, Inc., Global Distribution Services, Inc.,
7  and their predecessors-in-interest (collectively, "Plaintiffs") have been clients of Mobile
8  Motion for over seven years, during which time Mobile Motion has advertised Plaintiffs'
9  garage door business through (1) websites optimized through SEO to generate organic
10 search result traffic, and (2) artfully-crafted PPC campaigns with Google and Microsoft.
11 (*Id.* ¶ 15.)  It is undisputed that the parties' business relationship was governed by an oral
12 agreement wherein Mobile Motion received a flat-rate commission on Plaintiffs' gross
13 profits from leads generated through Mobile Motion's advertising efforts.

14 **B.  E Dating's Unrelated Business**

15 Defendant E Dating for Free, Inc. ("E Dating") operates an online Christian dating
16 service, located at <christiandatingforfree.com>. (Perez. Decl. ¶ 16.)  E Dating is not
17 related to Mobile Motion and does not have any agreements with or ownership interest in
18 Mobile Motion.  (*Id.* ¶ 17.)  E Dating has never had any business relationship whatsoever
19 with Plaintiffs or their predecessors-in-interest.  (*Id.* ¶ 18.)  Defendant Doron Kim is the
20 president of both Mobile Motion and E Dating.  (*Id.* ¶ 2.)  Defendants believe that E
21 Dating was only named as a defendant in this action by virtue of being owned by Doron
22 Kim.

23 Although Mobile Motion and E Dating are involved in separate businesses, like
24 Mobile Motion, E Dating's success is dependent upon the proprietary source code and
25 content management software for its website and effective PPC advertising.  (*Id.* ¶¶ 19,
26 21.)  In addition, E Dating's members also rely on E Dating to store backup copies of
27 millions of electronic communications internally sent by the members, including emails
28

KRONENBERGER BURGOYNE, LLP
150 Post Street, Suite 520
San Francisco, CA 94108
www.KBInternetLaw.com

1   and instant messages.  (*Id.* ¶ 20.)  E Dating stores these communications electronically
2   on Rackspace's servers. (*Id.*)

### C. The Central District Action

The parties' business relationship disintegrated on March 8, 2011, when Plaintiffs filed their Complaint in the Central District of California, Case No. 2:11-cv-01966-CAS-AGR, asserting the following causes of action against Mobile Motion, its principal (Doron Kim), and an unrelated entity also owned by Mobile Motion's principals (E Dating For Free, Inc.): (1) cybersquatting under the Lanham Act, 15 U.S.C. § 1125(d); (2) breach of oral contract; (3) breach of implied-in-fact contract; (4) breach of the implied covenant of good faith and fair dealing; (5) conversion; and (6) fraud.

In their Complaint, Plaintiffs claim that Mobile Motion breached the oral agreement by registering 117 domains (the "Domains") in its own name rather than that of Plaintiffs. (Declaration of Karl S. Kronenberger in Support of Defendants' Motion to Quash Third-Party Subpoenas ["Kronenberger Decl."] ¶2 & Ex. A at 19–20.)  Plaintiffs seek to have Mobile Motion transfer the Domains to Plaintiffs, including all of the website content that Mobile Motion developed and designed. (*Id.*)  Plaintiffs also want Mobile Motion to turn over its Google and Microsoft PPC campaigns to Plaintiffs. (*Id.*)  In other words, Plaintiff seeks to obtain all of the benefits of the oral agreement without having to pay Mobile Motion the agreed-upon commission.  Mobile Motion, of course, contends that Plaintiff is not entitled to any of this relief, and that, under the oral agreement, Mobile Motion is the proper owner of the Domains, the website content, and the PPC campaigns.

### D. The Discovery Order and Subpoenas

On March 8, 2011, concurrent with the filing of their Complaint, Plaintiffs filed an Ex Parte Application for Leave to Take Immediate Discovery. (Kronenberger Decl. ¶ 3.) Defendants were not provided any notice of this application, and had no opportunity to oppose it. (*Id.*)  The Court granted Plaintiffs' request, and issued an Order to that effect (the "Order"). (*Id.* Ex. B.)  The language of the Order, which was drafted and proposed to the Court by Plaintiffs, stated:

> [Plaintiffs] may serve immediate discovery on (1) Network Solutions, Inc., (2) Google, Inc., (3) Microsoft, (4) Tucows, Inc., (5) Marchex, Inc., (6) Rackspace, Inc., (7) Seyego, Inc., (8) Domains By Proxy, Inc. and (2) contactprivacy.com (collectively "Third Party Providers") by serving Fed. R. Civ. P. 45 subpoenas, which seek information sufficient to (1) identify the true registrant of each and every domain name that should rightfully be registered to Plaintiffs and (2) to obtain all account information related to accounts which Defendants have improperly denied Plaintiffs' [sic] access which it [sic] seeks recovery under the Complaint before the same is destroyed by Defendants.[1]

(Order at 2.) The Order further required Plaintiffs (1) to provide a return date of at least twenty-one days from the service of the subpoenas, and (2) to serve a copy of the Order along with the subpoenas. (*Id.*)

On March 17, 2011, Plaintiffs issued subpoenas to Google, Microsoft, Rackspace and others with a return date of April 1, 2011. (Kronenberger Decl. ¶ 4.) Plaintiffs' first round of subpoenas failed to provide at least twenty-one days for a response or to include a copy of the Order, in violation of the Order. (*Id.*) Accordingly, on March 23, 2011, Plaintiffs re-issued each of the subpoenas with a copy of the Order and a return date of April 14, 2011. (*Id.*) The Google, Microsoft, and Rackspace subpoenas were all issued from this Court and served on the companies' respective registered agents in Sacramento, California. (*Id.* ¶¶5-7 & Exs. C–E.) The Google and Microsoft subpoenas each contain forty-two (42) separate requests. (*Id.* ¶5-6 & Exs. C & D.) The Rackspace

---

[1] Of course, this language, drafted by Plaintiffs, inexplicably contains findings of fact unsupported by Plaintiffs' moving papers or any evidence in this case. The essential characteristic of the federal judicial system is the distribution of functions between judge and jury and the assignment of disputed questions of fact to the jury. *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 432 (1996), *quoting Byrd v. Blue Ridge Rural Elec. Cooperative, Inc.*, 356 U.S. 525, 537 (1958). The central dispute in this case is which party owns the rights to the Domains and PPC accounts under the terms of a 2003 oral agreement. These disputes are reserved for the jury at trial. Yet the language of the Order indicates that the Court has decided these issues and determined (1) that some of Defendants' domain names "should rightfully be registered to Plaintiffs," and (2) that any denial of access to Plaintiffs to third-party accounts was "improper" conduct on Defendants' part. Whether or not the Court actually made such findings (which would be improper, to say the least, on an unnoticed ex parte application with no supporting documentation), this language implies to those who receive a copy of the Order that such findings have been made. As a result, the Order is highly prejudicial to Defendants.

KRONENBERGER BURGOYNE, LLP
150 Post Street, Suite 520
San Francisco, CA 94108
www.KBInternetLaw.com

subpoena contains seven (7) requests. (*Id.* ¶7 & Ex. E.)  All three subpoenas exceed the bounds of the Court's order and the Federal Rules in that they overtly seek disclosure of Defendant's "trade secret[s] or other confidential research, development, or commercial information."  As such, each of the subpoenas must be quashed.

## II.  ARGUMENT

**A. This Court is the proper forum for Defendants' motion.**

Federal Rule of Civil Procedure 45(c)(3)(A) invests the authority to quash or modify a subpoena in the "issuing court."  *See also USA Technologies, Inc. v. Doe*, 713 F. Supp. 2d 901, 904–05 (N.D. Cal. 2010) (motion to quash subpoena issued by the Northern District properly before that Court even though the complaint was filed in the Eastern District of Pennsylvania); *VISX, Inc. v. Nidek Co.*, 208 F.R.D. 615, 616 n.1 (N.D. Cal. 2002) ("[O]nly 'the court by which the subpoena was issued shall quash or modify the subpoena.'" (citing Rule 45(c)(3)(A)).  Here, the subpoenas to Google, Microsoft, and Rackspace were all issued from this Court.  Accordingly, this Court is the proper forum for Defendants' motion.

There is "a split of authority as to whether the court which issued a subpoena can transfer a motion to quash to the court with underlying jurisdiction over the case." *IO Group v. J.W.*, No. C-10-05821 DMR, 2011 WL 240706 (N.D. Cal. Jan. 24, 2011) (citing *United States v. Star Scientific, Inc.*, 205 F. Supp. 2d 482, 485 n.4 (D. Md. 2002) for the proposition that "courts in the Second, Eighth, and Tenth Circuits have supported such transfers, while courts in the Third, Seventh, and D.C. Circuits have found transfer of discovery disputes inappropriate").  It is unclear whether such transfer is appropriate in the Ninth Circuit.  However, as an alternative to quashing the Google, Microsoft, and Rackspace subpoenas, Defendants respectfully ask this Court to transfer the instant motion to the Central District for decision.

//
//
//

### B. Each of the subpoenas seeks Defendants' confidential and proprietary information, including trade secrets.

Rule 45 permits the issuing court to quash a subpoena if it requires disclosure of "a trade secret or other confidential research, development, or commercial information." Fed. R. Civ. P. 45(c)(3)(B)(i). Here, Plaintiffs' subpoenas to Google, Microsoft, and Rackspace each require disclosure of Defendants' confidential research and business information, including Defendants' trade secrets and, as such, should be quashed.

#### 1. The marketing strategies and techniques sought by the Google and Microsoft subpoenas are Defendants' trade secrets.

The Google and Microsoft subpoenas seek detailed information that would permit Plaintiffs to recreate the PPC campaigns that Defendants have spent seven years developing, honing, and protecting from public disclosure. For example, the Microsoft subpoena seeks documents from 2003 to the present for fifteen different PPC accounts, as well as "any and all documents related to historical campaign data" for each of the accounts, including:

- All campaigns and keywords
- Budgets for each campaign and keyword
- Click charges for each keyword within each campaign
- Impressions served for each keyword
- Cost per click for each campaign
- The daily cost for each campaign
- Average position for each keyword within each campaign
- All conversion data for each campaign
- All targeted audiences for each campaign
- All auto targets for each campaign
- All dimensions of each ad and campaign
- All analyzed or non-analyzed campaign competition reports
- All Ad or Campaign categories
- Competitive range

KRONENBERGER BURGOYNE, LLP
150 Post Street, Suite 520
San Francisco, CA 94108
www.KBInternetLaw.com

- Impressions
- Average cost paid by all advertisers for each keyword
- Ad Groups status
- Default maximum cost-per-click for each ad group
- Managed placements
- Maximum cost-per-click for each advertising group
- Clicks for each group
- Impressions for each group
- CTR for each ad group
- Average cost-per-click for each campaign for each ad group
- Cost for campaign for each group
- Average position for each campaign for each group
- Number of conversions
- All campaign, ad group, and ad performance reports
- All urls and destination urls
- Any and all deleted reports, campaigns, ad groups and ads
- All keywords
- All deleted keywords
- All negative keywords
- High traffic keywords
- Non-active keywords
- All keyword performance metrics
- All analytics reports, campaigns, ad groups and ads
- All billing reports from 2003 to present
- Any other information or metrics made available to the accountholder

(Kronenberger Decl. ¶ 6 & Ex. D, Att. A, ¶¶ 1–42.)  The Google subpoena makes the exact same requests as the Microsoft subpoena with respect to fourteen (14) PPC accounts.  (Kronenberger Decl. ¶ 5 & Ex. C, Att. A, ¶¶ 1–42.)

CASE NO. 7 **DEFENDANTS' MPA ISO MTN. TO QUASH THIRD-PARTY SUBPOENA**

Under California law, which governs Plaintiffs' claims, a trade secret is "information, including a formula, pattern, compilation, program, device, method, technique, or process, that: (1) [d]erives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Cal. Civ. Code § 3426.1(d). Marketing strategies, plans, and techniques constitute trade secrets in California. *See*, e.g., *Whyte v. Schlage Lock Co.*, 101 Cal. App. 4th 1443, 1456, 125 Cal. Rptr. 2d 277, 288 (Cal. Ct. App. 2002). This should hold especially true where, as here, marketing is Defendants' trade.

For example, the parties in *Vinyl Interactive, LLC v. Guarino*, No. C 09-0987 CW, 2009 WL 1228695 (N.D. Cal. May 1, 2009), were entities who, like Defendants, were engaged in the business of online marketing and, specifically, in generating online customer leads through various advertising methods, including PPC advertising. *Id.* at *1. The entities were admitted competitors, and their trade secret misappropriation dispute arose when a key employee left the plaintiff company to work for the defendant. *Id.* at *1–2. The plaintiff asserted that the following information represented its trade secrets:

> 1) the identity of the publishers it uses; 2) the rates it pays to its publishers; 3) the quality of leads and conversion rates for each of its publishers; 4) the prices it gets for leads from its advertiser clients; 5) the identity of advertisers that support FCS; 6) the questions it places on lead forms to produce better results from certain publishers; 7) its profit margins for various advertisers; 8) the methods it uses to identify publishers; 9) its methods for reporting and tracking the quality of leads produced by its publishers; 10) its methods for deciding how much volume it seeks from each publisher, i.e., its "mix of high quality low volume publishers" and "low quality high margin publishers"; and 11) its data on and analysis of its competitors' products.

*Id.* at *7 (citations omitted). In assessing the likelihood of success on the plaintiff's claims before issuing a preliminary injunction, the court stated that the plaintiff "ha[d] established that most, if not all, of this information is likely protectable as a trade secret." *Id.* The

CASE NO. 8 **DEFENDANTS' MPA ISO MTN. TO QUASH THIRD-PARTY SUBPOENA**

court recognized that such information had independent economic and competitive value. *Id.* The court rejected the defendant's argument that "lead generation companies [are] aware of each other's costs and pricing through general methods of doing business." *Id.*

Just like the parties in *Vinyl Interactive*, Mobile Motion is in the business of Internet marketing. (Perez Decl. ¶ 3.) PPC advertising, such as that conducted through Google and Microsoft, is an integral, if not the singularly most important, part of the services Mobile Motion provides to its clients. (*Id.* ¶ 5.) Similarly, PPC advertising is integral to the success of E Dating's website. (*Id.* ¶ 21.) Defendants have each spent years developing and fine-tuning the formulas that make up their PPC campaigns in order to maximize website traffic and generate consumer leads for their clients. (*Id.* ¶ 6.) For example:

- Defendants have conducted A/B or "split" testing on all advertisements run as part of their PPC campaigns, whereby the response rates of control samples are compared to those for test samples. Defendants' current PPC campaigns are the result of years of such split-testing. (*Id.* ¶ 7.)
- Defendants have developed and used technological tools to dig out unique keywords and phrases to improve response rates. Defendants estimate that, as a result of these efforts, approximately ten percent of the keywords and phrases in their PPC campaigns are ones that even an experienced advertiser would not guess. (*Id.* ¶ 8.)
- Defendants have individualized each of their PPC campaigns according to geographic market. Each campaign employs a different combination of keywords and phrases which have proven successful within the market. Defendants' PPC campaigns include timing provisions (i.e., as to which time of day the campaigns are run) that are market-specific and the result of Defendants' research and development. (*Id.* ¶ 9.)
- Defendants have developed and incorporated dynamic elements into many of their PPC campaigns, wherein information garnered from an Internet user is included in a "customized" advertisement displayed to that user. (*Id.* ¶ 10.)

KRONENBERGER BURGOYNE, LLP
150 Post Street, Suite 520
San Francisco, CA 94108
www.KBInternetLaw.com

- Defendants have eliminated or "paused" certain keywords and phrases in their PPC campaigns that might appear to be obvious choices for a particular PPC campaign, but which Defendants' research and experience have proven to be unprofitable.  Thus, Defendants' *exclusion* of certain keywords and phrases is a trade secret cultivated through Defendants' research, the disclosure of which would provide a competitive advantage to Defendants' competitors. (*Id.* ¶ 11.)

- Defendants have fine-tuned their PPC budgets for campaigns in each market according to market-specific research, thus maximizing each individual campaign's profitability.  (*Id.* ¶ 12.)

All of the information sought by Plaintiffs through the Google and Microsoft subpoenas is the result of the foregoing research, development, and strategy by Defendants.  The information that constitutes Mobile Motion's PPC campaigns, in particular, is of independent economic value—it is the very reason that businesses such as Plaintiffs are willing to pay Defendants for their marketing services.  (*Id.* ¶ 14.) Defendants have made every effort to keep this information confidential. (*Id.*)  Indeed, the confidentiality of this information is evidenced by fact that Plaintiffs admit they do not have it after more than seven years of doing business with Mobile Motion.  The information being requested is sufficient to reconstruct Defendants' proprietary structure of its PPC campaigns.  These structures must be protected as they are not exclusive to Defendants' advertising for Plaintiffs and Plaintiffs could use them to obtain a competitive advantage over Defendants and Defendants' clients in competitive markets.  Plaintiffs should not be permitted to obtain Defendants' trade secrets—that is, their PPC campaigns—through the subpoenas to Google and Microsoft.  Accordingly, these subpoenas must be quashed.

**2. The billing information and backup data sought by the Rackspace subpoena are Defendants' confidential information and trade secrets.**

The Rackspace subpoena requests:

//

1. Any and all documents related to any and all accounts which are now or have ever been held by [Defendants] since 2003 including all historical data and including but not limited to the following:

    (1) All Account billing information including name, address, telephone number [,] email address, credit card information, bank account information and/or other payment information;

    (2) All Account information related to initiation dates, services purchased and services canceled;

    (3) All correspondence including all ticket system communications between Rackspace, US Inc. and Mobile Motion, Inc.;

    (4) All correspondence including all ticket system communications between Rackspace US, Inc. and Doron Kim;

    (5) All correspondence including all ticket system communications between Rackspace, US Inc. and E Dating For Free, Inc.;

    (6) All correspondence including all ticket system communications between Rackspace, US Inc. and Karl Kronenbuger [sic] and the firm of Kronenberger Burgoyne, LLP;

    (7) All server backup data for any of the websites located at any of the websites at any time prior to March 8, 2011. (These documents may be provided in unencrypted html, PHP or other such Zip format or via FTP to an accessible location for download).

(Kronenberger Decl. ¶ 7 & Ex. E, Att. A.) Here, as with the Google and Microsoft subpoenas, Plaintiffs seek information that is not essential to their case, but rather that would permit them to "reverse engineer" Defendants' marketing strategies through use of Defendants' trade secrets. Plaintiffs seek all "server backup data" in native format, which would permit Plaintiffs to upload Defendants' websites in their entirety (i.e., both the visual and structural content, including SEO) to Plaintiffs' domains.

//

Defendants have spent hundreds of thousands of dollars developing proprietary source code and content management software for E Dating's and Mobile Motion's websites. (Kronenberger Decl. ¶ 7 & Ex. E, Att. A, ¶¶ 13, 19.) Plaintiffs have not paid for any portion of this development and have no rights thereto. (Kronenberger Decl. ¶ 7 & Ex. E, Att. A, ¶ 13.) Courts have recognized website source code to be a trade secret and have deemed it undiscoverable absent a showing by the requesting party that its disclosure is both relevant and necessary to the claims at hand. *See, e.g.*, *Viacom Int'l Inc. v. Youtube Inc.*, 253 F.R.D. 256, 260 (S.D.N.Y. 2008); *cf. In re Apple & AT & TM Antitrust Litig.*, No. C07-05152 JW PVT, 2010 WL 1240295 (N.D. Cal. Mar. 26, 2010) at *3 (mere belief or speculation that production of software source code is necessary is insufficient). To that same end, Plaintiffs are asking Rackspace to provide a menu of the services Defendants enlisted in running their marketing business. It is inconceivable how any of this information is necessary to the prosecution of Plaintiffs' claims against Defendants, which are grounded in simple breach of contract. What is clear is that Plaintiffs are attempting to use an investigative discovery tool for an improper remedial purpose. Finally, the bank account and credit card information requested by Plaintiffs is Defendants' confidential financial information and is entirely irrelevant to Plaintiffs' claims. The totality of these circumstances is that Plaintiffs' subpoena to Rackspace must be quashed or, at the very least, substantially modified to prevent Plaintiffs from obtaining and misappropriating Defendants' confidential financial information and trade secrets.

### 3. **The Rackspace subpoena impermissibly seeks access to electronic communications in violation of the Stored Communications Act.**

Additional concerns are presented by the request in the Rackspace subpoena for all server backup data related to E Dating. (Kronenberger Decl. ¶ 7 & Ex. E, Att. A.) First, E Dating has never done business with Plaintiffs, and it is a stretch to see how E Dating's server backup data "since 2003 including all historical data" relates to any of Plaintiffs' claims. Second, because E Dating operates a dating website, E Dating's server backup data includes millions of "electronic communications" in "electronic

storage," which are protected from disclosure by the Stored Communications Act, 18 U.S.C. §§ 2701(a)(1) ("the SCA"). As part of its services, E Dating permits its members to communicate with other members over E Dating's website by sending instant messages and emails. (Perez Decl. ¶ 20.) Over 20,000 of these internal communications are sent each day by E Dating's members. (*Id.*) E Dating electronically stores backups of these communications on Rackspace's servers. (*Id.*)[2] The SCA prevents disclosure of these communications, and an attorney who obtains the same via subpoena is liable under the SCA. *See, e.g.*, *Theofel v. Farey-Jones*, 359 F.3d 1066, 1072-77 (9th Cir. 2004).

### C. Each of the subpoenas violates the Order.

The subpoenas drastically exceed the limitations on early discovery set by the Order. On its face, the Order authorizes subpoenas which "seek information sufficient to" (1) identify the registrant of each of the domains, and (2) to obtain certain account information. (Order at 2.) Yet the information requested by each subpoena reaches far beyond these limitations. It is inconceivable how things such as "dimensions of each ad campaign," "impressions served by each keyword," or "all correspondence with [Defendants' counsel]" fall within either of the two categories permitted by the Order. Plaintiffs clearly consider the Order to be a blank check to conduct whatever discovery they want. Moreover, Plaintiffs are exploiting the Order in an effort to obtain Defendants' intellectual property and trade secrets.

### III. CONCLUSION

For the foregoing reasons, Defendants respectfully request the Court to issue an order quashing Plaintiffs' subpoenas to Google, Inc., Microsoft Corporation and Rackspace, Inc. In the alternative, and as the Court deems fit, Defendants respectfully

---

[2] Similarly, the server files being requested contain "personal identification information" for E Dating's members, including their names, addresses, zip codes, email addresses, and credit card numbers. Civ. Code § 1747.08; *Pineda v. Williams-Sonoma Stores, Inc.*, 246 P.3d 612, 616–18 (Cal. 2011). Defendants go to great lengths to protect this data and, given the irrelevancy of it to Plaintiffs' claims, feel that it should not be disclosed.

KRONENBERGER BURGOYNE, LLP
150 Post Street, Suite 520
San Francisco, CA 94108
www.KBInternetLaw.com

1  ask the Court to transfer the instant motion to the Central District of California for
2  determination as part of the underlying action.

4  Dated: April 11, 2011                    **KRONENBERGER BURGOYNE, LLP**

6  By: /s/ Karl S. Kronenberger
   Karl S. Kronenberger
7  *Attorney in Charge; admitted pro hac vice*
   150 Post Street, Suite 520
8  San Francisco, CA 94108
   Telephone:  (415) 955-1155
9  Facsimile:  (415) 955-1158
   karl@KBInternetLaw.com

10 Attorneys for Defendants,
   Mobile Motion, Inc., Doron Kim, and E Dating
11 For Free, Inc.

CASE NO.                              14              **DEFENDANTS' MPA ISO MTN. TO QUASH THIRD-PARTY SUBPOENA**